OPINION
¶{1} Defendant-appellant William Keyes, Jr. appeals from his conviction of aggravated burglary entered after a jury trial in the Columbiana County Common Pleas Court. His attorney filed a no merit brief and requested leave to withdraw. After a thorough review of the filings and transcript in this case, we agree that there is no meritorious issue on appeal. For the following reasons, the judgment of the trial court is affirmed, and counsel is permitted to withdraw.
 STATEMENT OF THE CASE ¶{2} On October 26, 2007, appellant was indicted for the attempted forcible rape and the aggravated burglary of twenty-eight-year-old Joan Binder. The case was tried to a jury on January 22 and 23, 2008. At trial, Ms. Binder testified that she was at home in a trailer park in Wellsville, Ohio on Saturday, September 29, 2007. She put her two-year-old to bed and fell asleep on the couch watching television as she was waiting for the neighbor to bring her a movie. She awoke to knocking at her door. At the time, she was unaware that it was approximately 3:00 a.m. and believed that she had only been asleep for an hour. (Tr. 92, 109).
¶{3} Ms. Binder opened the door expecting to see her neighbor but instead saw appellant. She identified appellant at trial and explained that she knew him because they had attended school together. He also had been coming to the store where she had been employed (until she quit a week prior to the night of the incident). (Tr. 93, 110). She related that appellant had once asked for her telephone number, but she had refused to provide it to him. (Tr. 93). Quite a few times in the prior months, he drove by her trailer and waved to her as she was coming or going. (Tr. 94). She stated that appellant had never been in her trailer to her knowledge; although, it was possible that he had been there while her sister was babysitting since he was friends with her sister's ex-boyfriend. (Tr. 112).
¶{4} Ms. Binder testified that she was surprised to see appellant at her door. He said he needed to use the bathroom and entered without invitation walking straight back to the bathroom. Although, she acknowledged that she probably would have let *Page 3 
him enter. (Tr. 94-95). She then sat on her couch and wondered why he was in her bathroom for so long, approximately five minutes. (Tr. 96).
¶{5} When he came out, he sat facing her on the couch and announced: "This is how it's gonna be. You've got two options. Either you give me that pussy or I'm gonna take it." Ms. Binder responded by telling him no and ordering him to leave. He replied, "No, I'm serious," and he grabbed her shoulder. When she tried to escape his grasp, he started hitting her in the head. (Tr. 97). When he pulled on the leg of her jeans, she kicked him. The struggle proceeded to the floor where he put her in a choke hold. (Tr. 98, 100). He called her a bitch and threatened to knock her out, take what he wanted and kill her and her kids. (Tr. 99-100).
¶{6} At that point, she tricked him into releasing her by saying that she would cooperate. When he let her go, she ran to the telephone and called her neighbor. However, appellant threw the phone down before anyone answered. (Tr. 99). She then managed to open the door as he was pulling on her waist. She made it through the doorway, started screaming, broke free and ran to the neighbors' trailer. They were already exiting in response to her screams. (Tr. 101-103). She then saw appellant leave by way of a red Cavalier that was in the road bordering the trailer park. (Tr. 102).
¶{7} Ms. Binder explained that she was afraid to call the police due to appellant's threats and his statements that he had connections in the police department. She went to stay at her mother's house later that Sunday and was convinced to make a police report. (Tr. 104). She called the station on Monday morning and made an appointment with an officer for later that day. (Tr. 24, 34). At that time, she made a statement, identified appellant by name and immediately picked him out of a photographic line-up. (Tr. 30-32, 48). Both the police and the hospital where the police sent her took pictures of her injuries.
¶{8} As to these injuries, Ms. Binder testified that she suffered two split lips and had bruises on the top of her head, her arms, her knee, her back and her ear. (Tr. 106). A police officer confirmed that Ms. Binder complained of back pain, had a knot on her head, and suffered bruised and cut upper and lower lips, bruising on her arms and leg, a bruise inside her right ear and under her chin. (Tr. 44, 47). The emergency *Page 4 
room physician also confirmed that her extremities, lips, face and chin were bruised. (Tr. 126, 130-131). He noted that it takes "pretty good force" to cause the bruise inside her ear, which was likely caused by knuckles. (Tr. 127, 129).
¶{9} The police interviewed the neighbors who had responded to Ms. Binder's screams. They lived two trailers down, approximately thirty feet away from Ms. Binder's trailer. (Tr. 28-29). Mrs. Welch testified that sometime after 3:00 a.m., she was in her bedroom watching a movie and that her son and his friend were in the living room watching a replayed football game. (Tr. 58, 72, 81). Each witness confirmed hearing thumping and then screaming. (Tr. 58-59, 72, 81-82). It was noted that just prior to the screaming, someone had called on the telephone, which only rang twice. (Tr. 82).
¶{10} The neighbor's guest stated that when the screaming started, the dogs started tearing up the blinds so he looked out the window and saw Ms. Binder running toward their trailer and a white male walk from her porch to a red vehicle. (Tr. 82-83, 85). He and Ms. Binder both testified that the male was wearing jeans and a light shirt. (Tr. 87, 102). When they went out to investigate, the neighbors found Ms. Binder running toward them screaming, bleeding, crying and acting hysterical. (Tr. 59, 67, 83). She told them that Billy Keyes attacked her, wanted her to do something sexual and beat her when she would not accommodate him. (Tr. 60-62, 77-78).
¶{11} After the state rested, the defense presented no evidence. In closing, the defense highlighted various reasons to doubt Ms. Binder's credibility, asking them to consider: why she let appellant enter if they were merely acquainted; why she did not tell him to be quiet because her child was asleep; how appellant knew where the bathroom was if she had never seen him in her house before; why she did not call the police that night or even the next day; how a struggle that she claimed lasted twenty minutes could not have produced some destruction in the trailer; how her child slept through the incident; why two of the three testifying neighbors did not see the man and the car; and, why all the occupants of the Welch trailer would be awake that late at night. The defense also noted that appellant never tried to unbutton her jeans and pointed out that there was no allegation that sexual contact occurred. *Page 5 
 ¶{12} The jury found appellant not guilty of attempted rape but guilty of aggravated burglary. The court ordered a presentence investigation report, which showed a full criminal history that included three prior felony convictions and multiple misdemeanor convictions. (Tr. 218). The victim spoke at sentencing. Both the victim and the state requested a maximum sentence. The court imposed a maximum ten-year sentence for aggravated burglary. In its February 26, 2008 sentencing order, the court noted that appellant was currently serving a prison term for unrelated charges, that he had a lengthy criminal history, that recidivism was likely, that he needs to be punished and that the public needs protected.
¶{13} Appellant filed timely notice of appeal after new counsel was appointed. The docketing statement projected that the potential errors concerned the weight of the evidence and the maximum sentence. On July 7, 2008, counsel filed a no merit brief and a request to withdraw. We provided appellant thirty days to file his own brief in support of his appeal. However, he did not take advantage of this opportunity.
 NO MERIT BRIEF ¶{14} When appellate counsel seeks to withdraw and discloses that there are no meritorious arguments for appeal, the filing is known as a no merit or an Anders brief. See Anders v. California (1967),386 U.S. 738. In this district, it has also been called a Toney brief. SeeState v. Toney (1970), 23 Ohio App.2d 203. We explained the following points and procedures in Toney:
 ¶{15} An indigent defendant's constitutional right to counsel on his direct appeal requires that court-appointed counsel make arguments in support of the appeal to the best of his ability. If, after a conscientious examination of the case, counsel concludes there are no good grounds for appeal, counsel should so advise the court and request permission to withdraw, accompanying his request with a brief if counsel finds anything in the record that might arguably support the appeal.
¶{16} A copy of counsel's request and brief is to be furnished to the defendant, who is given time to raise any points that he chooses. The appellate court must then examine the record and any arguments presented by counsel or the defendant. If the court agrees that there are no arguable issues, it may grant counsel's request to withdraw and affirm the trial court's judgment. If the court finds any legal points *Page 6 
arguable on the merits, the court shall afford the indigent defendant assistance of counsel to argue the appeal. Id. at syllabus, 206-207, citing Anders at 774.
 FILE REVIEW ¶{17} We begin by holding that there are no speedy trial issues. Even if appellant was immediately arrested after indictment (which it appears he was not) and even if he was incarcerated the entire time solely on this charge, time would not have run as he was tried within ninety days of indictment. See R.C. 2945.71(C) (two hundred seventy days for felony charge); R.C. 2945.71(E) (triple time).
¶{18} We move on to study the only available suppression topic: the photographic line-up. Appellant is not in jail garb or posing in front of jail background. In fact, the pictures are from driver's licenses, and appellant is smiling. He is not prejudicially different from the other five members of the photo array. See State's Exhibit No. 1. In any event, the line-up was just a police tool used to ensure that appellant's name was not a nickname or alias and to make certain that they did not arrest the wrong person as appellant is a junior. (Tr. 35, 52). Most notably, the victim knew appellant by sight and by name for years. See State v. Williams (1995), 73 Ohio St.3d 153, 163. As such, there is nothing suggestive about the photographic line-up, and the identification was not otherwise unreliable. See State v. Waddy (1992),63 Ohio St.3d 424, 438.
¶{19} Next, we note that defense counsel objected to admission of the emergency room photographs on the basis that the testifying physician was not the photographer. (Tr. 134). However, photographs are admissible upon a showing that they are an accurate representation of the scene at the time of the event. See Evid. R. 901(A) (the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims). The foundation may be laid by either the photographer or any witness who is familiar with the scene at the time. See State v. Baugh (Apr. 22, 1997), 7th Dist. No. 93CA31. Here, the physician testified that the photographs were taken by his nursing director and that they accurately depicted the victim's condition at the time that he examined her. (Tr. 131-132). As such, there is no problem with authentication. *Page 7 
 ¶{20} There was also an objection at trial to the neighbor's relating what Ms. Binder said happened to her. (Tr. 60-61). However, the trial court properly used its discretion to determine that her statement qualified as an excited utterance. An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. Evid. R. 803 (such statement is admissible even though declarant is available as a witness). Here, Ms Binder made the statement within seconds of fleeing from her trailer and thus within seconds of escaping appellant's grasp. She had been struck multiple times and threatened. She had just fought her way out of her trailer and was forced to leave her child behind to get help. She was bleeding, crying, screaming and acting hysterical. (Tr. 60-62, 83). As such, there is no arguable issue here.
¶{21} We now set forth the pertinent elements of aggravated burglary:
¶{22} "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
¶{23} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *" R.C. 2911.11(A).
¶{24} Regarding the trespass element, the state cited case law and filed a written motion for an additional jury instruction that trespass may occur even after lawful entry if the privilege to remain has been terminated. No objections were voiced on the record. The court granted the state's request, instructing: "A trespass may occur even after lawful entry onto the premise if the privilege to remain on the premises has been terminated or revoked." (Tr. 196-197).
¶{25} This additional instruction about privilege being revoked is not erroneous. See State v. Steffen (1987), 31 Ohio St.3d 111, 115. "Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [victim's] home terminated the moment he commenced his assault on her." Id. *Page 8 
 ¶{26} Here, we have actual revocation of the privilege and need not even resort to inference of such revocation. See State v. Morton,147 Ohio App.3d 43, 2002-Ohio-813, ¶ 38, 51. That is, after Ms. Binder denied appellant's request to "give me that pussy or I'm gonna take it," she told him to leave; instead, he engaged in a violent struggle with her. (Tr. 97). It was therefore appropriate to instruct the jury that they could find that any privilege to remain had been revoked and terminated. As such, there was no ineffective assistance of counsel in failing to object to the state's request.
¶{27} Moreover, the state also argued that a trespass occurred even without resort to this additional instruction. Specifically, the state urged that appellant trespassed as soon as he entered because he entered by deception when he stated that he had to use the bathroom at 3:00 a.m. even though he was not friends with appellant. Had he told her the real reason he was there, she would not have stood by while he walked in.
¶{28} Because a rational trier of fact could find the elements of aggravated burglary proven beyond a reasonable doubt, the conviction is supported by sufficient evidence. State v. Thompkins (1997),78 Ohio St.3d 380, 387. It is unknown why the jury decided to acquit appellant of attempted rape. However, we need not speculate on this decision. Consistency between verdicts on different counts in an indictment is unnecessary, and the conviction on one charge can be upheld irrespective of its rational compatibility with the acquittal on another charge.State v. Lovejoy (1997), 79 Ohio St.3d 440, 446; State v. Hicks (1989),43 Ohio St.3d 72, 78; Browning v. State (1929), 120 Ohio St. 62, 71. Each count of a multi-count indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt. See id.
¶{29} As aforementioned, weight and credibility issues were the main focus of the defendant's closing argument. Weight of the evidence concerns the effect of the evidence in inducing belief. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. In order to reverse a jury verdict as being against the manifest weight of the evidence, the reviewing court would have to unanimously sit as the "thirteenth juror" and *Page 9 
determine that the true jury clearly lost its way and created a manifest miscarriage of justice requiring a new trial. Id.
¶{30} Because credibility of the witnesses and weight of the evidence are questions primarily for the province of the fact-finder, a verdict is reversed on manifest weight of the evidence grounds only in exceptional circumstances. See id.; State v. DeHass (1967),10 Ohio St.2d 230, 231. The jury occupies the best position to observe the demeanor, gestures, and voice inflections of the witnesses. Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80. When there are two fairly reasonable views of the evidence, we do not choose which one is more believable. State v. Gore (1999), 131 Ohio App.3d 197, 201 (7th Dist.)
¶{31} Here, Ms. Binder's testimony was not incredible. Although it is unlikely the struggle lasted for twenty minutes, it is understandable and common that a victim in her position would think such an event lasted longer than it actually did. Contrary to the suggestions of the defense, she explained why she did not immediately call police as his threats placed her in fear for her own and her children's lives and made her think he had police connections. She also explained how appellant might have known where her bathroom was as he was friends with her sister's ex-boyfriend and her sister babysits her children. Additionally, as the state pointed out, finding a bathroom in such a trailer is not difficult.
¶{32} Contrary to the defense arguments below, it is not wholly unlikely that the toddler would have slept through the incident. As to why she let appellant in at 3:00 a.m., she did not realize the late hour and did not actually invite him in. Rather, she opened the door believing her neighbor had arrived with the movie he was supposed to deliver and thinking that she had only been asleep for an hour. Appellant walked past her and said he needed to use the bathroom. She did not protest because she knew appellant from both the past and the present and because she was surprised. Although she might have ended up acquiescing to his desire to use her bathroom if he had not already walked past her, this potentially unwise choice need not affect her credibility.
¶{33} After examining the entire record, weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we cannot say that *Page 10 
the trier of fact clearly lost its way in resolving conflicts in the evidence or created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. SeeThompkins, 78 Ohio St.3d at 387. The jury was entitled to accept the victim's testimony after watching her on the stand. As such, the verdict finding appellant guilty of aggravated burglary is not contrary to the manifest weight of the evidence.
¶{34} As to sentencing, a presentence investigation was ordered and a victim impact statement submitted. The victim spoke, and appellant was given the chance to speak. Appellant's ten-year maximum sentence was within the range for a first degree felony. Considering his lengthy criminal history and the facts of this case, the sentence was not contrary to law or an abuse of discretion. Finally, the court notified appellant of post-release control at sentencing and incorporated post-release control into its judgment entry. See State v. Bezak,114 Ohio St.3d 95, 2007-Ohio-3250, ¶ 16; State v. Jordan, 104 Ohio St.3d 21,2004-Ohio-6085, ¶ 17.
¶{35} In conclusion, after fully reviewing the file and combing the transcript, we conclude that there are no arguable issues for appeal.
¶{36} For the foregoing reasons, the judgment of the trial court is hereby affirmed and counsel's motion to withdraw is granted.
Donofrio, J., concurs.
 Waite, J., concurs. *Page 1