[Cite as *State v. Petefish*, 2011-Ohio-6367.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 10 MA 78 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| JOEL PETEFISH | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 10 CR 23

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant: Atty. Megan Graff
Comstock, Springer & Wilson Co.
100 Federal Plaza East
Suite 926
Youngstown, Ohio 44503

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: December 7, 2011

WAITE, P.J.

**{1}** Appellant, Joel Petefish, appeals the judgment of the Mahoning County Common Pleas Court, convicting him on three counts: one of burglary, a violation of R.C. 2911.11(A)(2)(B), a first degree felony, and two of abduction, a violation of R.C. 2905.02(A)(2)(C): One count of abduction involved Bette Merrick ("Bette"), and one involved her daughter, Melissa Merrick ("Melissa"), both third degree felonies. For the following reasons, Appellant's conviction and sentence are affirmed.

Factual and Procedural History of the Case

**{2}** Appellant had been married to Bette and the two had a son, Joel, Jr. They divorced in the early nineties. After the divorce Bette remarried and had a daughter, Melissa. Bette and her husband Steven lived together with both children, Joel, Jr. and Melissa. Appellant moved to Georgia during the early nineties and lived there for approximately twenty years. (Tr. Vol. III, p. 506.) In the late summer of 2009, he made his way north from Georgia, staying with family along the way. (Tr. Vol. III, pp. 494-495.) When he returned to the Youngstown area his father refused to allow him to stay in the family home. Appellant's mother contacted his ex-wife, Bette, told her he had nowhere to stay other than to camp in the woods, and asked if she could help. Bette agreed to let Appellant wash, eat, and nap from time to time, depending on his behavior and the weather, first at the townhouse she shared with her husband, and later in the one-bedroom apartment she and her daughter shared. (Tr. Vol. II, p. 343.) Bette would ask Appellant to leave if his behavior was inappropriate or if he was using alcohol or drugs. (Tr. Vol. II, pp. 345-346.)

**{3}** During October of 2009, Bette and Steven began a trial separation. (Tr. Vol. II, p. 342.) Bette and her daughter moved to a separate apartment, but Steven continued to pay for their groceries and upkeep, and set up their phone and cable. (Tr. Vol. II, pp. 369, 371, 382.) Bette's apartment had only one set of keys, which she kept. She, alone, was listed on the lease, and paid rent herself. (Tr. Vol. II, p. 375-376.) Appellant continued to stay with Bette and her daughter at the apartment, either several times a week, according to Bette and Melissa, or continuously, according to Appellant. (Tr. Vols. II & III, pp. 370, 414; cf. 512) In December, Bette decided to tell Appellant to get a job and leave. (Tr. Vol. II, pp. 345, 381.) It appears Appellant left when she asked, but continued to return periodically during December.

**{4}** During the day on December 24, 2009, Bette left the apartment unlocked, as was her practice, so her son, Joel, Jr., could come in to pick up his Christmas present. (Tr. Vol. II, pp. 351-352; 376-377.) Bette testified that she returned to her apartment and found Appellant there: he had her "daughter's Kool-Aid all over his face, and ran outside and did these snow angels and urinated on them." Bette stated that she was upset by his presence and his behavior, and told him to leave. (Tr. Vol. II, pp. 381, 387; 347-348.) Bette prepared to pick up her daughter and go to her parents' house for the holiday. Bette and Appellant agreed that he would drop by the gathering so she could take him to his mother's house before she and her daughter continued to her husband's house to celebrate Christmas. (Tr. Vol. II, p. 349.) Appellant never arrived at her parents' party. Instead, when Bette and Melissa stopped at the apartment on their way to Steven's,

they were surprised by Appellant, who was drunk. The apartment was in disarray. Clothing was strewn everywhere, soda and alcohol were spilled on the floor and on the dining room table, food was left either raw on the counter or burning in the oven. (Tr. Vols. II & III, pp. 350; 399-400.) Bette told Appellant, again, that he had to leave. Appellant started "ranting and raging." (Tr. Vol. II, p. 351.) Appellant remained while Bette and her daughter prepared to leave. Finally Melissa offered him a few dollars and he left. (Tr. Vol. III, pp. 400; 407.)

{5} Shortly after Appellant left with her money, Melissa tried to make a phone call and discovered the house phone was disconnected. The landline was digital and neither Melissa nor Bette knew how to set it back up. They realized then that Melissa's cell phone was missing. They concluded that Appellant had taken the phone and headed toward the door to borrow a neighbor's phone. (Tr. Vol. II & III, pp. 352-354; 411.) As Bette reached the door there was a knock. She saw Appellant through the peep hole and asked him, through the door, for her daughter's phone. He held it up and said she had to open the door so he could hand it to her. She cracked the door open and, rather than pass her the phone, Appellant pushed the door more fully open, forcing the two women into the wall as he entered the apartment. He began mumbling and yelling and screaming. When Bette told him they were leaving and he also needed to leave, Appellant responded "[y]ou're not going anywhere." (Tr. Vol. II, pp. 355-357.) The two women observed Appellant enter the kitchen area, take two knives and put them in the pockets of his pants. (Tr. Vols. II & III, pp. 356; 402.)

**{6}** Betty and her daughter ran to the bedroom. As the two were hurrying away from Appellant, Melissa, to whom Appellant had thrown the cell phone, pretended to call her grandparents while actually calling her father. Under the guise of telling her grandmother they had made it home safely, she conveyed to her father that he needed to call the police. (Tr. Vol. III, p. 403.) As the two entered the bedroom, Betty told Melissa to pack a bag, but Appellant broke into the bedroom and stood over the two women "calling us names and said you're not going anywhere. I'm not going to allow you. You're not going anywhere." (Tr. Vol. II, p. 357.) While Appellant, who was apparently drunk, alternated between standing over the women and standing in the doorway shouting at them, he frequently put his hands in his pockets. Both women were very aware that the knives were in his pockets and were afraid that he was going to use the knives to hurt them. (Tr. Vol. II & III, pp. 385-386; 403-405.) Betty continually asked Appellant to leave, to leave her daughter alone, and never come back. (Tr. Vol. II, p. 358.) Because the apartment was on the third floor there was no exit other than the front door.

**{7}** Suddenly, something appeared to distract Appellant in the kitchen, and he left the bedroom. (Tr. Vol. II, p. 384.) Betty took her daughter's arm and the two ran to the front door, reaching for her keys from a table as they ran past. (Tr. Vol. II, 359-360.) The two jumped into the car and drove down the street.

**{8}** Betty and Melissa waited in a parking lot down the block for the police to arrive. After several cruisers arrived, they returned to the apartment. Meeting Officer Asad Chaibi, they gave statements at the scene. The first officer to arrive on

the scene found the apartment a mess with a single chair oddly placed in the center of the living room. Fearing for his safety, the officer secured Appellant on the chair while waiting for back-up. (Tr. Vol. III, pp. 426; 440; 459.) All of the officers involved noted how shaken the women were; that they were reluctant to leave their car and then reluctant to have to see Appellant again at the hearing seeking a restraining order. (Tr. Vol. III, pp. 429; 441; 447; 464.)

{9} At trial, Appellant testified that the events described by Bette and her daughter never happened. He stated that he never threatened them or prevented them from leaving. He maintained that he returned to the Youngstown area because Bette asked him to and to be with his son. He testified that Bette and he were in an intimate relationship and they moved into the apartment together, and that he regularly contributed to the household and spent more nights in the apartment than Melissa did. Appellant testified that Melissa was upset by the obvious relationship he had with her mother, that she always had a problem with him, and that the police were called that night due to a family disagreement after Melissa became upset when he asked her mother for a kiss. (Tr. Vol. III, pp. 509-510, 515, 518, 530-531.) Bette denied any sexual relationship with Appellant. (Tr. Vol. II, p. 363.) She said that she and her daughter shared the single bedroom in the apartment. (Tr. Vol. II., p. 342.)

{10} Appellant was indicted by the grand jury on January 28, 2010. Count one was for burglary, a violation of R.C. 2911.11(A)(2)(B), a first degree felony. Counts two and three charged abduction, violations of R.C. 2905.02(A)(2)(C); count two was for the abduction of Bette, count three was for the abduction of Melissa, both

third degree felonies. Appellant did not waive his speedy trial rights. Trial was initially set for early April, but Appellant requested and received a continuance. The jury trial commenced on April 19, 2010 and continued through April 22, 2010. Bette and Melissa testified for the state; as well as responding Officers Chaibi, Ditullio, Moran, and Quinn. Detective Lodwick, of the child and family crimes division, also testified. Appellant and his mother testified for the defense.

**{11}** The defense moved for acquittal on the merits at the conclusion of the state's case-in-chief. The motion was overruled.

**{12}** A verdict on each count was returned by the jury on April 22, 2010. Appellant was sentenced and judgment entered on May 7, 2010. Appellant received six (6) years of incarceration on count one and four (4) years of incarceration on counts two and three, which merged, to be served consecutively. Credit was given for one-hundred and thirty-five (135) days served, and treatment for alcoholism recommended. Appellant filed his timely appeal on May 10, 2010.

<u>Assignment of Error No. 1</u>

**{13}** "The State of Ohio failed to introduce sufficient evidence to prove beyond a reasonable doubt that defendant-appellant, Joel Petefish, committed aggravated burglary and abduction."

<u>Assignment of Error No. 2</u>

**{14}** "The Jury verdict finding defendant-appellant, Mr. Petefish, guilty of aggravated burglary and abduction is against the manifest weight of the evidence."

**{15}** Appellant's two assignments of error challenge the sufficiency and the manifest weight of the evidence; because the facts and testimony concerned in each assignment are identical the two assignments will be addressed together.

**{16}** A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged. An inquiry into sufficiency focuses on whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E. 2d 492, paragraph two of the syllabus. In contrast, a challenge to the manifest weight of the evidence addresses not the mere existence of evidence on each element, but the effect of that evidence in inducing belief. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Even where a reviewing court finds a verdict is supported by sufficient evidence, the same verdict may be found to be against the manifest weight of the evidence. Id. To evaluate the manifest weight of the evidence, an appellate court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Id. at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The

"[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other * * * the party having the burden of proof will be entitled to their verdict, if [the jury], on weighing the evidence in their minds, * * * shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics * * *'" (Emphasis sic.) *Thompkins* at 387. Although the reviewing court is sometimes described as "the thirteenth juror" when conducting this review; the weight to be given the evidence and the credibility of the witnesses are still primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

{17} In this case Appellant was charged on three counts. The first count constituted a violation of 2911.11(A)(2)(B), aggravated burglary, by trespassing in an occupied structure as defined by R.C. 2909.01(C), while in possession of a deadly weapon or ordnance in violation of R.C. 2923.11, a first degree felony. The second and third counts are violations of R.C. 2905.02(A)(2)(C), abduction: one count with regard to Bette, and one count with regard to Melissa, a minor, both third degree felonies.

{18} Ohio Revised Code Section 2911.11 reads in pertinent part: "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply * * * (2) The offender has a deadly weapon or dangerous ordnance on or about

the offender's person or under the offender's control." Pursuant to R.C. 2923.11, a deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Finally, R.C. 2905.02(A)(2) and (C) provide, in part: "No person, without privilege to do so, shall knowingly do any of the following: * * * (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear; * * * (C) Whoever violates this section is guilty of abduction, a felony of the third degree."

### (A) Sufficiency of the Evidence

{19} Appellant attacks the sufficiency of the evidence with regard to two elements of the burglary charge, trespass and use/possession of a deadly weapon, and on the restraint element of the abduction charge.

### (1) Trespass

{20} Appellant's argument that the state failed to present sufficient evidence establishing the trespass element of burglary rests on the fact that his testimony conflicts with testimony of other witnesses concerning the extent of his privileges in Bette's apartment. It is undisputed that over the years since the end of their marriage Bette sometimes allowed Appellant to sleep in her place of residence. Bette also allowed Appellant to shower and eat when necessary, and to store some seasonal possessions, e.g. golf clubs, that he was unable to carry with him. It is equally undisputed that Bette required Appellant to follow rules, including abstaining from alcohol, when he stayed with her, and that he was required to leave when she asked.

The parties also agree that the apartment is an occupied structure; that Appellant's name does not appear on the lease; that Appellant does not pay rent, utilities, or make regular contributions to the household; and that Appellant does not have his own set of keys and is unable to come and go without making prior arrangements with Bette. Appellant admits he receives mail at his mother's house, not the apartment. The record also reflects that he sleeps in a variety of places other than the apartment, including the woods.

{21} Bette testified that on the day of the incident she told Appellant he had to leave and left the apartment with her daughter for a family party. When Bette and her daughter returned to the apartment expecting it to be empty, they instead found Appellant, drunk, and the apartment in disarray. Bette told Appellant to leave, he became angry, and initially left, taking her daughter's cell phone with him. Appellant returned almost immediately, pushed his way into the apartment, picked up two knives, refused to leave, and prevented Bette and her daughter from leaving.

{22} As we have previously noted, "[a] trespass may occur even after lawful entry onto the premise if the privilege to remain on the premises has been terminated or revoked." *State v. Keyes*, 7th Dist. Case No. 08 CO 11, 2008-Ohio-6592 ¶24 (finding the quoted instruction concerning revocation proper.) Even where a revocation of a privilege is not explicit, the termination of the privilege to remain may be inferred. *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 509 N.E.2d 383. ("Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the

victim's] home terminated the moment he commenced his assault on her.") Here, as in *Keyes*, there was an actual revocation of privilege and there is no need to resort to inference of revocation. See *State v. Morton*, 147 Ohio App.3d 43, 2002-Ohio-813, 768 N.E.2d 730, ¶38, 51. The fact that Appellant was allowed to store property in the apartment, had conditional privileges within the property, and may have hung pictures for Bette or performed other minimal maintenance does not alter her ability to verbally terminate any privilege to remain. The instruction given the jury on the trespass element, without objection, was that "[a] spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling." (Tr. Vol. III, p. 622.)

{23} Appellant cites *Radvansky v. City of Olmstead Falls*, 2005 Fed. App. 0024P, 395 Fed. 3d 291 (6th Cir. 2005) for the proposition that a tenant cannot be prosecuted for trespassing in the leased property, in support of his argument. *Radvansky* addresses a situation where a tenant was arrested and indicted without probable cause. Mr. Radvansky had a verbal rental agreement whereby he paid $450 a month to share the common areas of a house, excluding his separate locked bedroom, with the homeowner. Mr. Radvansky was current through April, but $60 dollars short on his May rent. While he was out of town in early May, the owner changed the locks. When he returned to the property he made multiple attempts to enter and retrieve property.

{24} On Mr. Radvansky's third attempt he broke a window and screen to crawl into the house. A neighbor saw him and called the police who responded to a

burglary in progress. Mr. Radvansky was arrested on the premises, "[d]espite the officers' pre-existing knowledge that he was currently involved in a dispute with his landlord, his repeated protestations that he lived there, undisputed documentary evidence which supported his claim [including his mail to that address], and the presence of his personal property, clothing and furnishings within the house." Id. at 269; see also 300-301; 304; 307. The Sixth Circuit found that a month-to-month tenancy had been created by payment and acceptance of rent, and that under the circumstances the information relied on by the arresting officers did not constitute probable cause. Id. at 304. The fact that Mr. Radvansky was a bona fide rent-paying tenant was dispositive.

{25} None of the circumstances and indicia that supported Mr. Radvansky's claim of tenancy exist in the matter at bar. Appellant has failed to establish any legal right to the property that would prevent Bette's testimony from establishing the elements of trespass. The jury was instructed on the elements of trespass and the testimony at trial addresses those elements. Appellant's argument as to the credibility of Bette's testimony and the fact that his own testimony differs is relevant only to the weight of that testimony, not the question of whether it is sufficient to establish the elements of the offense. We hold that the state's evidence is sufficient as to the trespass element.

**(2) Deadly weapon.**

{26} Appellant makes two arguments concerning the element regarding his deadly weapons charge. First, Appellant concedes that he placed two knives in his

pockets, but argues that the knives are not in and of themselves deadly weapons. Appellant's argument is without merit. State's exhibit two clearly indicates Appellant had two knives, one in his back right pocket and the second labeled: "FROM HIS RIGHT CARGO POCKET, A SWITCHBLADE WITH A CLIP VISIBLE." (State's Exh. 2, p. 2.) As detailed below, a switchblade is a deadly weapon within the meaning of R.C. 2911.11, because although not all knives are automatically classified as weapons, the fact that a switchblade is spring mounted and may be deployed with one hand places it in the category of "any instrument * * * designed or specially adapted for use as a weapon." R.C. 2923.11.

{27} In determining the types of knives that constitute deadly weapons, a number of courts have found R.C. 2923.20 instructive. The code section, captioned: "Unlawful transactions in weapons," prohibits the manufacture of, possession of, and sale or furnishing "to any person other than a law enforcement agency for authorized use in police work, any brass knuckles, cestus, billy, blackjack, sandbag, switchblade knife, springblade knife, gravity knife, or similar weapon." R.C. 2923.20. (See, e.g. *In re Gochneaur*, 11th Dist. No. 2007-A-0089, 2008-Ohio-3987, ¶19, where the court, citing the statute, concluded "knives opening easily with one hand may be considered (for obvious reasons), as being designed or adapted for use as weapons." See also, *State v. Cattledge*, 10th Dist. No.10AP-105, 2010-Ohio-4953, *inter alia*).

{28} Several other appellate courts have found that switchblades are weapons per se. A switchblade knife, by virtue of its spring-loaded action, is by definition adapted for use as a weapon. *State v. Johnson,* 8th Dist. No. 81299, 2003-

Ohio-4177, at ¶23 (where the knife was "a pocket knife which required both hands to open" and "not a switch blade," the state had to present evidence that it was designed or adapted for use as a weapon); see also *State v. Mullins* (Dec. 2, 1981), 1st Dist. No. C–810093, 1981 WL 10140 at *4-5 (the fact that "a switchblade knife can be used as a toothpick" does not remove it from the statutory category of "designed or specifically adapted for use as a weapon"); and former R.C. 2923.021 (prohibiting possession of 'any knife fitted with a mechanical device for automatic release of the blade, opening the knife and locking the knife in the open position, commonly known as a switch or automatic spring knife')," as well as *State v. Totarella*, 11th Dist. No. 2002-L-147, 2004-Ohio-1175, ¶60 (in which the court also found that a switchblade was a deadly weapon).

{29} It appears that no court in the state has determined that a switchblade is not a weapon. In fact, some courts have held that switchblades are, per se, deadly. The court in *State v. Orlett* (1975), 44 Ohio Misc. 7, 335 N.E.2d 894 elaborated: "It is further acknowledged that some weapons are per se deadly. Others, owing to the manner in which they are used, become deadly. A gun, pistol or switchblade knife are per se deadly. Other weapons can become deadly and assume deadly character depending upon the manner and circumstances of their use. There is a question of fact presented in such cases and where such a question exists, the fact must be resolved by either the jury or the court. In determining whether an instrument not inherently 'deadly' or dangerous assumes these characteristics, the court may consider the nature of the weapon, the manner of its

use, the actions of the user, the intent and the mind of the user and the capability of the instrument to inflict death or serious bodily harm." Id. at 9. See also *State v. Ash*, (May 3, 1979), 8th Dist. No. 38808, ("For purposes of R.C. 2923.11(A), there are two types of weapons: those which are per se deadly, such as a gun, pistol, or switchblade knife; and those which can become deadly and assume deadly character depending upon the manner and circumstances of their use.") The presence of a switchblade in a jacket pocket is sufficient to support a conviction for concealing a deadly weapon in violation of R.C. 2923.12. *State v. Simpson* (May 22, 1985), 1st Dist. No. C-840597.

{30} Appellant never disputes that one of the two knives in question is a switchblade. In fact, Appellant never mentions or addresses that detail, instead repeatedly referring to it as a "pocket knife" and maintaining that a pocket knife is not a weapon. Appellant relies on *State v. Cathel* (1998), 127 Ohio App.3d 408, 713 N.E.2d 52, mis-citing the case as standing for the proposition that "[c]ircumstances cannot transform a pocket knife into a weapon." (Appellant's Brf., p. 11.) The Ninth District's decision actually focused on the fact that although "[t]here is no dispute that the knife in question is capable of inflicting death," the pocket knife in that instance took two hands to open and "was neither a switch or other spring-loaded blade, nor a gravity blade capable of instant one-handed operation, and differs only in its somewhat greater length from the familiar type of clasp knife carried as a useful tool by thousands." Id. at 411, 413 citing *State v. Anderson*, 2 Ohio App.3d 71, 440 N.E.2d 814. The circumstances to which the court refers are those surrounding the

reasons Mr. Cathel was detained by police and his knife discovered. The *Cathel* court concluded, contrary to Appellant's argument, that although neither hiding from the police in the early morning hours, nor walking down the street in the early morning hours (the reasons the defendant was detained) could convert possession of a folding knife into possession of a deadly weapon, there may exist other circumstances that could. The fact that the knife Appellant carried, unlike the knives at issue in *Cathel* and *Anderson*, is a switchblade, similar to the knives involved in *Orlett, Simpson, Ash, Totarella, Mullins, Johnson*, leads us to find that it is a "deadly weapon" within the meaning of R.C. 2911.11(A)(2).

{31} Appellant's second argument concerning the deadly weapon element focuses on the language of R.C. 2911.11(A)(2). Appellant claims that the statute requires that the deadly weapon actually be used, not merely carried or possessed, during the commission of the crime and that its use must be proved beyond a reasonable doubt. This conclusion is contrary to the plain language of the statute as well as the very authority cited by Appellant. The statute reads in the disjunctive. A violation occurs when "[t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control." R.C. 2911.11(A)(2).

{32} When the statute was revised in 1973 to consolidate ten separate breaking and entering offenses into three, the legislature identified the relative potential for harm as the distinguishing factor among the consolidated offenses. It is due to the focus on the potential for physical harm that aggravated burglary, which

"carries the highest degree of risk that someone may be harmed," "is the most serious of the three breaking and entering offenses in the new code" because it is committed by an offender who possesses or controls a deadly weapon or dangerous ordnance. R.C. 2911.11, LSC Note 1973. The plain language of the statute tracks the intent of the legislature: the mere possession of a deadly weapon on the person when unlawfully entering an occupied structure increases the risk of harm to persons, therefore, it is possession during commission that the enhanced penalty is designed to deter.

{33} Possession of a deadly weapon is sufficient to satisfy R.C. 2911.11(A)(2), (B). The fact that Appellant never "brandished" the weapon is irrelevant. Once Appellant has conceded he possessed the knives, the only relevant question is whether the knives in question are "deadly weapons." As discussed above, the fact that one of the two "pocket knives" was, in fact, a switchblade, clearly places the knife in the prohibited category. Hence, the state's evidence is sufficient as to this element.

**(3) Abduction.**

{34} Appellant's only "sufficiency" argument with regard to abduction is to challenge the testimony of Melissa and Bette as "self serving." Questioning the motivations of witnesses does not rise to the level of a sufficiency issue. The relevant inquiry in sufficiency is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61

Ohio St.3d 259, paragraph two of the syllabus. As Appellant's own argument concedes, the state offered probative testimony from both women that he forced his way into the apartment, took a pair of knives, put them in his pockets, then forced his way into the bedroom where they had retreated, stood over them, placed his hands in his pockets where the knives were kept and repeatedly told them they could not leave. (Tr. Vol. II, p. 355.) Bette further testified she thought at the time that he was so drunk and in such a rage that either she or Melissa would be killed. (Tr. Vol. II, p. 357.) The testimony given by Melissa tracks that of her mother. Deputy Chaibi further testified that when the two women met him at the apartment, they were "terrified." (Tr. Vol. III, p. 429.) The record of testimony in this instance does not support a conclusion that the trier of fact lost its way. It is certainly sufficient to establish the elements of the offense.

### (B) Manifest weight of the evidence.

{35} "'Weight is not a question of mathematics, but depends on its *effect in inducing belief*.' (Emphasis sic.)" (Internal citations omitted.) *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, supra, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The state's case was supported by the testimony of both victims, who were consistent with one another, consistent with their statements at the scene, and consistent with their later discussions with Detective Lodwick. The impressions of all the officers who responded to the call were of two

extremely frightened women who were reluctant to leave their car when they knew that Appellant was still inside the apartment, and who were reluctant to go to court when they knew he would be there. As discussed above, the testimony presented by the state established all elements of the crimes charged. Although Appellant attempted in his testimony to suggest an alternative explanation for the events of the day, the jury did not find this testimony persuasive. Credibility is an issue for the jury and their decision is to be given due deference. There is nothing in the record, here, to suggest that the fact finder lost its way. Appellant's two assignments of error are overruled.

### Conclusion.

{36} Appellant's two assignments of error, challenging the sufficiency and the manifest weight of the evidence are overruled and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs.