[Cite as *State v. McCrary*, 2014-Ohio-1468.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                 )
                                     )    CASE NO.   12 MA 135
        PLAINTIFF-APPELLEE,     )
                                       )
VS.                         )    O P I N I O N
                                     )
DEANDRE McCRARY,       )
                                     )
        DEFENDANT-APPELLANT.   )

CHARACTER OF PROCEEDINGS:        Criminal Appeal from Common Pleas
                                            Court, Case No. 11CR1288.

JUDGMENT:                   Affirmed.

APPEARANCES:
For Plaintiff-Appellee:              Attorney Paul Gains
                                          Prosecuting Attorney
                                          Attorney Ralph Rivera
                                          Assistant Prosecuting Attorney
                                          21 West Boardman Street, 6th Floor
                                          Youngstown, Ohio 44503

For Defendant-Appellant:           Attorney John Lazcko
                                            3685 Stutz Drive, Suite 100
                                          Canfield, Ohio 44406

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: March 31, 2014

VUKOVICH, J.

{¶1}     Defendant-appellant Deandre McCrary appeals after being convicted of aggravated murder, aggravated robbery, and a firearm specification.  Appellant, who was fifteen years old at the time of the offense, argues that the juvenile court abused its discretion in binding him over to be tried as an adult.  As to his subsequent adult trial, appellant contends that the trial court abused its discretion in allowing a witness to testify about an incident that occurred a few hours before the shooting.  He also asserts that the court should have granted his motion to suppress regarding the photographic lineups.  Finally, he claims that the verdict was contrary to the manifest weight of the evidence.  For the following reasons, the judgment of the trial court is affirmed.

                                        STATEMENT OF THE CASE

{¶2}     At approximately 11:42 p.m. on Saturday, June 19, 2011, sixteen-year-old Brandon Adkins was shot and killed in a driveway on South Avenue in Youngstown, Ohio.  He had been at a party on Mistletoe Avenue earlier in the evening; appellant and seventeen-year-old co-defendant Rayshawn Royal were also at that party.  Brandon arrived at his home on Philadelphia Avenue around 10:30 p.m.  Seventeen-year-old Keyoshia then called Brandon to ask if he could walk her and her one-year-old baby home from the South Avenue residence of their fourteen-year-old friend Nautica.  Brandon walked over and waited in the drive.  Keyoshia, Nautica, and fourteen-year-old Miranda came out to the front porch.

{¶3}     Two male juveniles (said to be fifteen-year-old appellant and seventeen-year-old Rayshawn Royal) approached Brandon with guns drawn and ordered him to lift his shirt and empty his pockets.  The gunmen soon fired three or four shots at Brandon, who died at the scene after suffering three separate gunshot wounds to the back, abdomen, and forearm.  The gunmen fled on foot.  It is said that appellant briefly ran back to collect his shells and Royal was nearly hit by a car which was driving down South Avenue as he fled the scene.

{¶4}     Keyoshia left the scene with her child, who had been on the porch in a stroller at the time of the shooting.  Nautica and Miranda were brought to the police

station that night for interviews. Miranda initially provided descriptions of the shooters but did not provide the shooters' names. A detective eventually asked Miranda about two names (Little D and Ray Royal) that he had obtained from the crowd gathered at the murder scene. Miranda thereafter stated that Little D was the skinny one who returned to pick up his shell casing.

{¶5} Nautica provided the descriptions of the assailants as well and also provided the names Boosie and Ray Royal (without the officers first mentioning any names). Nautica explained that she had seen the shooters around before. (Testimony demonstrated appellant was known as both Little D and Boosie.)

{¶6} On Monday, Keyoshia was brought in for questioning. She provided descriptions and was argumentative when the police insisted that she knew the shooters' names. She eventually stated that one was named "D something." She then picked out appellant and Royal from photographic lineups. The other girls viewed the photo lineups on Monday as well. Miranda identified appellant, but Nautica could not identify him from the photographs.

{¶7} That day, a delinquency complaint for murder was filed in the juvenile Court against Rayshawn Royal and appellant. Royal was subject to mandatory bindover, but appellant was subject only to discretionary bindover due to his age and lack of serious prior adjudications. After a probable cause hearing and an amenability hearing, appellant was bound over to the adult system.

{¶8} Appellant was thereafter indicted for aggravated murder and aggravated robbery with firearm specifications. Just before trial, appellant filed a motion to suppress evidence derived from the photographic lineup, alleging the requirements of the photographic array statute were not satisfied, the procedure was unduly suggestive, and the identifications were unreliable. On June 5, 2012, a suppression hearing was conducted, and the trial court denied the motion to suppress.

{¶9} The case against appellant and his co-defendant was tried to a jury. The details of the trial are further discussed infra within the pertinent assignments of error. Both defendants were found guilty as charged. The trial court sentenced

appellant to twenty-five years to life for murder, ten concurrent years for aggravated robbery, and three consecutive years for the merged firearm specifications, for an aggregate sentence of twenty-eight years to life in prison. *See* 07/17/12 Judgment Entry and 0815/12 Amended Judgment Entry (to correct clerical error). Appellant filed a timely notice of appeal on July 26, 2012. His brief was not filed until September 20, 2013. Appellant sets forth four assignments of error on appeal.

ASSIGNMENT OF ERROR NUMBER ONE

**{¶10}** Appellant's first assignment of error alleges:

**{¶11}** "THE JUVENILE COURT JUDGE ABUSED HIS DISCRETION BY RELINQUISHING JURISDICTION AND BINDING THE DEFENDANT-APPELLANT'S CASE OVER TO THE COMMON PLEAS COURT BY FAILING TO ADEQUATELY CONSIDER ALL THE APPLICABLE FACTORS FOR TRANSFER PURSUANT TO R.C. 2152.12(D)(E)."

**{¶12}** Appellant was subject to discretionary bindover. *See* R.C. 2152.10(B) (at least 14 at the time of the offense and charged with a felony). *See also* R.C. 2152.12(B). *Compare* R.C. 2152.10(A)(1)(b) (mandatory bindover for child under 16 if category one offense and prior category one or two adjudication with prior sentence to Department of Youth Services). To order discretionary bindover, the juvenile court must find that the child was at least 14 years at the time of the act, there is probable cause to believe the child committed the act charged, and the child "is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B)(1)-(3).

**{¶13}** The first step is thus the preliminary hearing, which was held on October 19, 2011. At the hearing, the court accepted stipulations as to the cause of death and that appellant was fifteen at the time of the charged act and heard Keyoshia's testimony. She said that she knew the two defendants from school and the neighborhood and had become friends with them in the six months before the incident. (Tr. 12-13, 28-29). She testified that the two defendants approached the victim in the driveway, pulled out guns, told him he had five seconds to empty his pockets, and then both defendants started shooting. (Tr. 12-15).

{¶14} She provided a confusing statement on cross-examination about why she originally provided only descriptions rather than names to police at her interview and seemed to suggest that she arrived at her identification after discussions with others. (Tr. 18-20). She then clarified that the day after the shooting, some people expressed belief that the shooters were co-defendant Royal and a different friend, but she insisted that it was appellant rather than that other friend who was with Royal. (Tr. 32-34). She also explained that she initially did not want to get involved. (Tr. 38-39). She added that she was positive that these two defendants shot the victim. (Tr. 39).

{¶15} The juvenile court found probable cause to believe appellant committed murder. Appellant suggests that this witness's testimony lacked certainty. However, that was a credibility issue best left for the fact-finder. Regardless, appellant does not specifically argue against the finding of probable cause here. Rather, he assigns as error the juvenile court's weighing of the factors in making the subsequent amenability decision.

{¶16} After a finding of probable cause is made at the preliminary hearing, the court shall continue the proceeding for a full investigation, which shall include a mental examination, after which the amenability hearing shall be held. Juv.R. 30(A), (C). *See also* R.C. 2152.12(C). In deciding amenability, the court shall consider whether the applicable factors in division (D) (which weigh toward a transfer) outweigh the applicable factors in division (E) (which weigh against a transfer). R.C. 2152.12(B)(3). The factors in favor of a transfer include: (1) the victim suffered physical or psychological harm or serious economic harm; (2) the physical or psychological harm was exacerbated due to the victim's physical or psychological vulnerability or age; (3) the child's relationship with the victim facilitated the act; (4) the act was committed for hire or as a part of a gang or other organized criminal activity; (5) the child had a firearm and used, displayed, brandished, or indicated possession of the firearm; (6) the child was awaiting delinquency adjudication or disposition, under community control, or on parole at the time of the act; (7) the results of prior juvenile sanctions and programs indicate rehabilitation will not occur in

the juvenile system; (8) the child is emotionally, physically, or psychologically mature enough for transfer; and (9) there is insufficient time to rehabilitate the child in the juvenile system. R.C. 2152.12(D).

{¶17} The factors weighing against a transfer include: (1) the victim induced or facilitated the act; (2) the child acted under provocation; (3) the child was not the principal actor or was under the negative influence or coercion of another; (4) the child did not cause physical harm to any person or property or have reasonable cause to believe that such harm would occur; (5) the child has not been adjudicated delinquent previously; (6) the child is not emotionally, physically, or psychologically mature enough for transfer; (7) the child has a mental illness or is mentally handicapped; and (8) there is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides reasonable assurance as to public safety. R.C. 2152.12(E).

{¶18} These factors are non-exclusive, and any other relevant factor can be considered. R.C. 2152.12(D), (E). The order of transfer shall state the reasons for transfer. Juv.R. 30(G). *See also* R.C. 2152.12(B)(3); R.C. 2152.12(I). The juvenile court possesses wide latitude to retain or relinquish jurisdiction, and the ultimate decision rests within the juvenile court's sound discretion. *State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989) (and the totality of the evidence governs). This is because an amenability hearing is a broad assessment of individual circumstances that is inherently individualized and fact-based. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14.

{¶19} A mental examination was completed and offered as evidence at the amenability hearing. At that hearing, the court advised that it had reviewed the psychologist's report. (Tr. 5). The report stated that appellant disclosed that he had been previously detained at the juvenile justice center eight times due to grand theft auto and probation violations and that he had been on probation for "many years." He specified that he likely failed his junior year in high school because he was incarcerated for so much of it (prior to this offense). Appellant was said to be familiar with court terminology and procedure. He had no problems with understanding

questions or following instructions and had a normal level of intelligence. He appeared upbeat and confident. He had good reasoning abilities, and his answers suggested that he was capable of having insight into what motivates his behavior and attitudes. It was then opined that he may only superficially cooperate with behavioral treatment, and the opinion as to long-term treatment was guarded. It was concluded that he was competent to be adjudicated either in juvenile or adult court.

{¶20} The state presented the following arguments in favor of bindover: the victim was a juvenile; appellant was friends with the victim; the relationship facilitated the offense; appellant not only had and brandished a gun, but he also fired it; he was not only on probation, but he was also awaiting disposition of a probation violation at the time of the incident; the result of prior juvenile sanctions and programs indicate that rehabilitation would not occur in the juvenile system as he had been before the court with several probation violations; he was emotionally, physically, and psychologically mature enough for transfer; and there was insufficient time to rehabilitate him within the juvenile system before his twenty-first birthday. (Tr. 3-5). The state acknowledged that he had no prior commitments to the Department of Youth Services (DYS) and that the gang factor was inapplicable. (Tr. 3-4).

{¶21} The defense admitted that this was a very serious offense and recognized appellant's prior felony adjudication for grand theft auto but emphasized that his subsequent interactions with the court were for probation violations that arose out of that one felony. With regards to the topic of rehabilitation in the juvenile system, the defense opined that appellant had been ill-served by the juvenile probation system but that DYS will be better equipped to meet his vocational and psychological needs. The defense emphasized that a major point was that appellant has never been in the custody of DYS. The defense also stated that appellant is now sixteen, suggesting that five years should be sufficient time for DYS to address his issues. (Tr. 6-8).

{¶22} The court took the matter under advisement, and then ordered bindover to the common pleas court in a November 28, 2011 judgment entry. As to the factors favoring retention in R.C. 2152.12(E), the court found that none applied in appellant's

favor. As to the factors favoring transfer in R.C. 2152.12(D), the court made the following findings: appellant was fifteen at the time of the offense, appellant had a lengthy juvenile record; the victim was a juvenile; appellant knew the victim; appellant used a firearm to commit the crime; appellant was emotionally, physically, and psychologically mature enough for transfer; prior contact with the juvenile system was not successful; and there was not enough time to rehabilitate him in the juvenile system. The court concluded that appellant was not amenable to care or rehabilitation within the juvenile system and the safety of the community warranted that he be subject to all adult sanctions.

{¶23} Appellant contends that the trial court abused its discretion in weighing the applicable factors and failed to adequately consider all of the applicable factors. He notes that the juvenile court must state its reasons for transfer and characterizes the findings in the court's entry as mere "lip service," stating that the findings were a mere recap of the state's arguments from the amenability hearing. Appellant believes the court ignored defense counsel's focus on the fact that appellant had never previously been committed to DYS. He reiterates that the five years before he turned twenty-one would have provided sufficient time for the juvenile system to address his issues. He also complains that the bindover hearing was brief.

{¶24} However, the state presented the arguments in favor of bindover, the psychological report was submitted, and appellant was not prohibited from setting forth any information that he believed would help his cause. *See State v. Carmichael*, 35 Ohio St.2d 1, 3-4, 298 N.E.2d 568 (1973). Thus, the length of the hearing does not assist appellant's argument. Although a more detailed entry could have been drafted, the court's entry is not deficient. The bindover entry states the reasons for the transfer and contains the applicable factors that the court weighed.

{¶25} Notably, it is the applicable factors the court must outline, not the inapplicable factors. R.C. 2152.12(B)(3). Appellant was provided with notice of the court's reasoning, and the entry provides sufficient specificity to permit meaningful review, i.e. one need not assume the juvenile court had adequate reasons to support its bindover decision as those reasons are stated therein. *Compare Kent v. United*

*States*, 383 U.S. 541, 561, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). (where the Court was concerned with the lack of hearing and refusal to provide reports to counsel, and where the Court stated that the court provided no reasons for its bindover, noting that the statement need not be formal nor must it contain conventional findings of fact).

**{¶26}** In conducting our own review of the factors, we conclude that the juvenile court's discretionary bindover decision was not unreasonable, unconscionable, or arbitrary. The physical harm the victim suffered was death. *See* R.C. 2151.12(D)(1) (physical harm). The offense being evaluated was murder with a firearm. *See* R.C. 2152.12(D) (any other relevant factor). This is a very serious offense. *See Watson*, 47 Ohio St.3d at 95 (holding that the seriousness of the offense can be considered even though it is not a listed bindover factor, and this was before the language of the law changed to add "any other relevant factor"). A firearm was not only brandished by appellant, but it was also fired. *See* R.C. 2151.12(D)(5) (had firearm and used, displayed, brandished, or indicated possession). Three to four shots were fired at the victim from close range. *See* R.C. 2152.12(D) (any other relevant factor). (Prelim. Hrg. At 14). Other teens and a baby were present at the scene of shooting. *See id.*

**{¶27}** The victim was a sixteen-year-old juvenile. *See* R.C. 2152.12(D) (any other factor), (D)(2) (harm exacerbated due to psychological vulnerability or age). Appellant was fifteen and three-quarter years of age at the time of the offense (as opposed to newly turning fourteen for instance). *See* R.C. 2152.12(D) (any other relevant factor). Had the offense occurred three months later, when appellant turned sixteen, the bindover would have been mandatory. *See* R.C. 2152.12(A)(1)(a). Appellant knew the victim and was said to be friends with him. *See* R.C. 2152.12(D)(3) (relationship with victim facilitated offense). (Prelim. Hrg. at 13).

**{¶28}** At the time of the shooting, appellant was not only on community control but had a pending probation violation. *See* R.C. 2152.12(D)(6). He had a prior felony adjudication for grand theft auto and multiple past probation violations. *See* R.C. 2152.12(D)(7). He had been previously detained at the juvenile justice center eight times and was in lock-up most of the prior school year (prior to this

offense). *See id.* It is not unreasonable to conclude that the results of prior juvenile sanctions and programs indicated rehabilitation would not occur in the juvenile system. *See id.*

{¶29} The psychological report also expressed concern with appellant's ability to be treated and provided insight into his maturity, understanding, and intelligence. From this report and considering the fact that he has dealt with the juvenile system many times and spent many nights in the justice center in the past, it was not unreasonable to conclude that appellant was emotionally, physically, and psychologically mature enough for transfer. *See* R.C. 2152.12(D)(8). Finally, at the time of the amenability hearing, there remained less than five years during which appellant could be incarcerated in the juvenile system for murdering a juvenile with a gun. *See* R.C. 2152.12(D)(9). Considering all of the evidence, it was not unreasonable to conclude that this was insufficient time to rehabilitate appellant in the juvenile system. *See id.*

{¶30} The only factor which was not applicable in division (D) was the one concerning commission of the act for hire or as part of a gang or other organized criminal activity. *See* R.C. 2152.12(D)(4). As the trial court stated, none of the factors weighing against a transfer in division (E) were applicable. For example, the victim did not induce or facilitate the offense. *See* R.C. 2152.12(E)(1). Appellant did not act under provocation. *See* R.C. 2152.12(E)(2). Appellant was a principal actor, and there was no suggestion that he was under the negative influence or coercion of another. *See* R.C. 2152.12(E)(3). Appellant was not said to suffer a mental illness, nor is he mentally handicapped. *See* R.C. 2151.12(E)(7). None of these factors were proposed as applicable by the defense either. The other factors in division (E) are inapplicable as they represent the opposite of certain factors found applicable from division (D). For instance, there was no absence of physical harm or absence of a reasonable belief that harm would occur, and appellant did not have a clean juvenile record. *See* R.C. 2152.12(E)(4)-(5). *See also* R.C. 2152.12(E)(6) (if child not mature enough for transfer), (8) (if sufficient time to rehabilitate in juvenile system and level of security in that system provides reasonable assurance of public safety).

{¶31} That appellant had not previously been incarcerated in the juvenile system's equivalent of a prison was proposed by the defense as "any other relevant factor." However, the trial court could properly refuse to utilize this factor in appellant's favor. As he had a prior felony adjudication by age 15 and had been incarcerated in the juvenile system's equivalent of a jail an inordinate number of times due to multiple probation violations, the fact that he had not been sentenced to DYS commitment did not carry great weight. Appellant believes that the juvenile system could have sufficiently rehabilitated him before release at age twenty-one. However, the trial court's opposite conclusion was a reasonable one. As aforementioned, five years would be a minimal sentence for murder with a firearm, and appellant's psychological report did not express confidence in the chances of rehabilitation.

{¶32} Under the totality of circumstances, we conclude that the trial court did not abuse its discretion in weighing the factors and concluding that appellant "is not amenable to care or rehabilitation within the juvenile system and the safety of the community may require that the child be subject to adult sanctions." *See* R.C. 2152.12(B)(3). This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER TWO</u>

{¶33} Appellant's second assignment of error provides:

{¶34} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND ABUSED ITS DISCRETION BY PERMITTING AT TRIAL WITNESS TESTIMONY OF AN EXCITED UTTERANCE, OVER APPELLANT'S OBJECTION, INADMISSIBLE HEARSAY EVIDENCE, WHEN THE EVIDENCE DID NOT FALL WITHIN THE EXCITED UTTERANCE EXCE[P]TION AND WAS ALSO CONTRARY TO THE OHIO RULES OF EVIDENCE 402 AND 403(A), WHEN SUCH EVIDENCE WAS NOT RELEVANT AND ITS ADMISSION OUTWEIGHED THE DANGER OF PREJUDICE TO APPELLANT RECEIVING FAIR TRIAL."

{¶35} Nineteen-year-old Shaquala testified about a party she held at her house on Mistletoe Avenue in the hours prior to the shooting. She collected a $1 cover charge while Brandon's job was to make sure no one went anywhere in the

house except the basement. (Tr. 687-688). Appellant and Royal also attended. (Tr. 686). When the music stopped due to blowing of a fuse in the amplifier, most of the crowd went outside, but Brandon assisted Shaquala with the amplifier in the basement. (Tr. 688-689). Shaquala's seventeen-year-old cousin soon came running downstairs. Shaquala stated that her cousin was shocked, scared, acting "[l]ike something bad was going on outside," and "hyper, rushing for me to hurry up to get upstairs and see what was going on." (Tr. 691). Shaquala then testified that the cousin declared that "Ced was robbing Rayshawn and Little D." (Tr. 689-690, 705). Ced referred to Cedrick Robinson. (Tr. 706). Shaquala and Brandon then ran outside where appellant was standing by a tree. (Tr. 706). Cedrick had two guns; he "cocked back" one gun and announced, "this gun only got two bullets in it." Shaquala then started yelling for people to leave and threatening to call the police, at which time appellant started walking down the street. (Tr. 709).

{¶36} In this assignment of error, appellant raises four Rules of Evidence in support of his argument that this testimony should have been excluded: Evid.R. 803(2) (excited utterance), Evid.R. 402 (relevancy), Evid.R. 403(A) (probative value versus prejudice), and Evid.R. 404(B) (other acts). Pursuant to Evid.R. 803(2), an excited utterance is not excluded by the hearsay rule even if the declarant is available to testify. An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. Evid.R. 803(2). We use a four-part test to judge whether a statement is admissible as an excited utterance: (1) there was an occurrence startling enough to produce a nervous excitement in the declarant and sufficient to still her reflective faculties, making her declarations the unreflective, spontaneous, and sincere expression of her actual impressions; (2) the declaration, even if not strictly contemporaneous with its exciting cause, was made before there was time for the nervous excitement to lose a domination over reflective faculties; (3) the declaration related to the startling event or circumstances surrounding the event; and (4) the declarant had an opportunity to personally observe the matters asserted in the

declaration. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166.

**{¶37}** Appellant only contests the application of the fourth prong of this test, arguing that the cousin may not have personally observed the matters asserted in the declaration. The issue is thus whether the trial judge reasonably found that the declarant had an opportunity to observe personally the matters asserted in the declaration existing in this case. *See State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993). *See also Jones*, 135 Ohio St.3d 10, at ¶ 173 (fourth prong helps ensure reliability of declarant's statement; holding that the confession was the event that startled the declarant even though she did not personally observe the events described in that confession).

**{¶38}** Appellant emphasizes that Shaquala could not definitively state that her cousin watched the event take place. Still, a witness who hears an excited utterance will not always know with certainty that the declarant was watching the event about which the declaration was made; this is often assumed by the witness due to the declarant's excited state, especially where that listener then runs upstairs and views the aftermath of the event described by the declarant who retrieved her. Importantly, the trial court can use circumstantial evidence and make reasonable inferences that a declarant had an opportunity to observe personally the matters asserted in their statements; for instance the court can view the statement itself, the excited state of the declarant, the proximity of the declarant to the event, and the other pertinent surrounding circumstances. *See, e.g., City of Columbus v. Bishop,* 10th Dist. No. 08AP-300, 2008-Ohio-6964, ¶ 10-12; *State v. Holdbrook*, 12th Dist. No. CA2005-11-482, 2006-Ohio-5841, ¶ 42-52; *State v. Johnson*, 6th Dist. No. L-05-1001, 2006-Ohio-1232, ¶ 21; *State v. Moorman*, 7 Ohio App.3d 251, 252-253, 455 N.E.2d 495 (1st Dist.1982).

**{¶39}** In sum, the cousin was scared and she was acting as if she had seen the shocking event. She rushed Shaquala out of the house and brought her to the scene in the front yard from which vantage point Shaquala herself viewed the aftermath of the incident: Cedrick standing by appellant holding two guns and

announcing that one only had two bullets. From the circumstances, the trial court could reasonably conclude that the cousin had an opportunity to personally observe the event. Thus, we continue to address appellant's other evidentiary arguments.

{¶40} Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence which is not relevant is not admissible. Evid.R. 402. It is within the sound discretion of the trial court to apply its common experience and logic to determine the relevance of evidence. *State v. Lyles*, 42 Ohio St.3d 98, 99-100, 537 N.E.2d 221 (1989). The relevancy test does not require the evidence to directly prove an element of the offense. *State v. Tapscott*, 7th Dist. No. 11MA26, 2012-Ohio-4213, 978 N.E.2d 210, ¶ 23. Therefore, evidence that shows motive, for instance, can be relevant. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 75.

{¶41} Relevant evidence is admissible unless prohibited by another rule, statute, or the constitution. Evid.R. 402. For instance, relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A); *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107 ("Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant."). And, evidence of other acts is inadmissible to prove that the accused acted in conformity with his bad character but may be admitted for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). *See also* R.C. 2945.59 (a correlating statute). The exceptions are construed against admissibility, but if other acts evidence tends to establish an exception, it can be utilized even if it negatively affects the defendant's character. *See State v. Jamison*, 49 Ohio St.3d 182, 185, 552 N.E.2d 180 (1990); *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), ¶ 1 of syllabus.

**{¶42}** The state may believe that the contested evidence demonstrated the occurrence of some triggering event and/or that the contested evidence tends to show motive. However, no evidence showed that Brandon had interaction with the defendants or even with the perpetrator of the possible robbery at that party. There was no connection established between Cedrick and Brandon and thus nothing to connect Cedrick's actions to Brandon being accosted elsewhere later that night. Thus, relevancy was lacking. However, we cannot say that the admission of this testimony created material prejudice. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66 (reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion *that has created material prejudice*).

**{¶43}** Pursuant to the harmless error doctrine, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(B).

**{¶44}** In this case, three eyewitnesses placed appellant with a gun pointing at the victim. Two of these witnesses testified that appellant fired shots at the victim; the other witness had just turned away in order to inform her mother that a robbery was taking place out front. One witness also testified that she saw appellant run back down the driveway to collect the empty shells. This evidence diminishes any prejudicial effect to a non-reversible value. *See also* Assignment of Error Number Four (manifest weight of the evidence). Accordingly, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER THREE

**{¶45}** Appellant's third assignment of error provides:

**{¶46}** "THE TRIAL COURT ERRED AS A MATTER OF LAW AND TO THE PREJUDICE OF APPELLANT AND VIOLATED HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT BY OVERRULING APPELLANT'S MOTION TO SUPPRESS AND ADMITTING INTO EVIDENCE APPELLANT'S PHOTOGRAPHIC LINE UP IDENTIFICATIONS."

**{¶47}** Appellant makes various arguments under this assignment of error. First, he contends that there was no evidence of compliance with the statutory line-up procedures in R.C 2933.83(B)(1)-(3). Division (B)(1) provides, "Unless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup." Division (B)(2) then states, "When it is impracticable for a blind administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability." Finally, division (B)(3) provides, "When it is impracticable for either a blind or blinded administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability." The administrator is the person conducting the lineup. R.C. 2933.83(A)(1). A blind administrator does not know the identity of the suspect. R.C. 2933.83(A)(2). A blinded administrator may know who the suspect is but does not know which lineup member is being viewed by the eyewitness. R.C. 2933.82(A)(3).

**{¶48}** The trial court watched the videotaped interviews and line-ups and heard testimony at the suppression hearing. The court found that Captain Foley did not take part in the questioning of the witnesses but merely entered the room briefly during Keyoshia's interview to encourage her cooperation. The court concluded that knowledge of a case does not preclude an administrator from being considered blinded. Captain Foley testified that he considered himself a blinded administrator, surmising that a blind administrator knows nothing about the case and he knew the names of the suspects. (Supp.Tr. 73, 84). He did not create the ten folders or otherwise assist in preparing the line-up. (Supp.Tr. 63). He remained unaware of which folder contained appellant's photograph. He did not know which set of ten folders involved appellant and which set of ten involved co-defendant Royal. (Supp.Tr. 64). The detective who prepared the folders did not indicate to the administrator who was in them or what order they were in. (Supp.Tr. 29). And, pursuant to the statutory procedure, the administrator shuffled the folders and read the instructions to the witnesses including the statement that they should not show him the photographs. (Supp.Tr. 64-65).

**{¶49}** As the trial court concluded, he was at least a blinded administrator. Appellant thus focuses on Captain Foley's failure to place in writing the reason as to why a blind administrator was not used. Appellant also briefly raises ineffective assistance for failing to elicit further testimony from Captain Foley on this issue. However, the captain testified that he considered himself a blinded administrator and opined that a blind administrator is preferred but not necessary.

**{¶50}** As appellant acknowledges, a failure to comply with R.C. 2933.83 does not require suppression of the pretrial identification. *See, e.g., State v. Shaw*, 7th Dist. No. 12MA95, 2013-Ohio-5292, ¶ 54 (failure to strictly comply does not render a line-up impermissibly suggestive); *State v. Parks*, 7th Dist. No. 11CA873, 2012-Ohio-3011, ¶ 18; *State v. Parks*, 7th Dist. No. 11CO20, 2012-Ohio-3010, ¶ 17 ("the statute does not provide for automatic exclusion of a line-up conducted in a manner different than that provided thereunder"). Thus, a lack of strict compliance with R.C. 2933.83(B)(2)'s statement that the reason for not using a blind administrator must be put in writing is a factor for trial court consideration but does not require suppression.

**{¶51}** This is because the statute provides that the failure to comply with R.C. 2933.83 or the procedures adopted thereunder "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(1). Moreover, the statute provides that the failure to comply can be raised at trial to show misidentification, and the defendant can seek a jury instruction thereon. R.C. 2933.83(C)(2)-(3). *See also* R.C. 2933.83(D) (different procedures can be adopted by the law enforcement agency if they are more effective).

**{¶52}** As appellant concedes, we continue our analysis by evaluating the two-prong test to assess the constitutionality of a line-up.

**{¶53}** When a witness has been presented with a suspect before trial, due process requires a court to suppress the identification if the presentation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all of the circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

An identification is unreliable if there is a very substantial likelihood of irreparable misidentification under the totality of the circumstances. *Waddy*, 63 Ohio St.3d at 438-439. Factors determining the degree of reliability include: the opportunity of the witness to view the perpetrator during the crime, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated by the witness at the presentation, and the length of time between the crime and the presentation. *Id.* at 438. Both parts of the test must be satisfied by a defendant challenging a lineup. Thus, if the presentation was not unduly suggestive, the court need not proceed any further in the test, and likewise, if the court finds the identification reliable, it need not consider suggestiveness. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19; *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001).

{¶54} Appellant urges that the procedure was unnecessarily suggestive and/or the identification was unreliable because a detective mentioned the defendants' names, the witnesses previously knew the defendants, and they may have known some of the other people whose photographs were used in the array. Miranda was interviewed first. She stated that she could see the suspects due to the streetlight. She described one as a skinny black male aged 15 or 16. The other suspect was described as a chubby black male aged 17 or 18. She initially denied knowing the shooters' names. She was eventually told that the police already knew the names of the suspects, and a detective provided the names of Ray Royal and Little D. Miranda then said Little D was the skinny one who picked up the shell casing. During a photographic lineup nearly two days later, she identified appellant as a shooter.

{¶55} Testimony revealed that Nautica was not provided time to speak with Miranda between their interviews. (Tr. 928). Without being told the suspects' names by police, Nautica said the chubby perpetrator was Ray Royal and the other was Boosie (said to be another nickname for appellant). Nautica did not later identify appellant from the photographic lineup. She noted that she knew another person in the array.

{¶56} Keyoshia provided descriptions as one suspect being fat and carrying a black gun. The other suspect she described as skinny and carrying a silver gun. The detectives mentioned no names during the interview, and she was argumentative on the topic of naming the shooters. Captain Foley briefly entered the room to ask her to cooperate. (Testimony was presented on the difficulty in getting witnesses to name names in these types of situation and how calling in a higher official is often used to press for cooperation.) Keyoshia told police that one shooter was known as "D something." She identified both defendants from the photographs.

{¶57} The trial court watched the videos of the interviews and the line-ups and heard the suppression testimony. The trial court's decision that the identifications were not prompted by unduly suggestive procedures was within that court's province as the fact-finder who weighs the factual evidence and any inferences. *See State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992) (on a suppression motion, trial court weighs evidence and makes credibility determinations). Although it took some minutes to convince Miranda to implicate appellant by name, questioning her for less than a half hour, mentioning that Little D was a suspect, and her agreement that he was the shooter did not render the subsequent lineup unusable. And although Keyoshia was initially very argumentative about her lack of knowledge of the shooters' names, she was compliant in picking them out of a lineup.

{¶58} There is no rule that if the police release the name of a person of interest in a crime, any photographic array would be unduly suggestive because the witnesses learned this name prior to the viewing. In fact, a witness will often read about a suspect's arrest in the paper or on the news and sometimes even realize that they recognize the photograph displayed therein. *See, e.g., State v. Jones*, 7th Dist. No. 12MA181, 2013-Ohio-5915, ¶ 46 (witnesses did not identify defendant in photographic lineup {and chose a different photograph} but stated that they recognized the defendant on the news upon his arrest). This type of information on police suspects does not per se preclude a later identification. *See State v. Davis,* 76 Ohio St.3d 107, 113, 666 N.E.2d 1099 (1996) ("Even assuming [the detective] used Davis's name, that would not affect the reliability of Baker's identification.").

**{¶59}** Likewise, there is no prohibition on showing a witness a photographic line-up merely because they personally know the suspect. In fact, this is typically a factor in favor of reliability and against suggestiveness. *See, e.g., State v. Keyes*, 7th Dist. No. 08CO11, 2008-Ohio-6592, ¶ 18 (knew by sight and name). One of the main uses of a lineup is to ascertain that the name or nickname provided verbally by the witness matches the person the police intend to arrest. *See State v. Jackson*, 4th Dist. No. 11CA20, 2012-Ohio-6276, ¶ 27 (disposing of the argument that a lineup is suggestive merely because witness knew defendant)

**{¶60}** Finally, it is not the function of the police to somehow construct a line-up that does not include filler photographs of people whom the witnesses may end up knowing; as the trial court noted, such a line-up would have excluded the defendants themselves. The trial court could properly find that the procedure used in conducting the line-up was not unduly suggestive for the reasons urged by the defense.

**{¶61}** Appellant also states that the identifications were not reliable as Miranda named the suspects only after the police badgered her for half an hour, Nautica provided the names but then could not identify appellant's photograph in the lineup, and Keyoshia said that she did not know the names twenty-five times until Captain Foley intervened to request cooperation after which she picked the shooters from a lineup. Appellant points out that it was dark and the shooters may have been wearing hoods.

**{¶62}** Because we concluded the procedure was not unduly suggestive, reliability need not be reached. *State v. Adams*, 7th Dist. No. 08MA246, 2011-Ohio-5361, ¶ 24, citing *e.g. State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 19. In any event, the trial court reviewed the videos of the interviews and line-ups and the transcript from the juvenile bindover where Keyoshia explained her identification and her initial reluctance. She expressed that she was positive that these defendants were the shooters. The interviews of Miranda and Nautica occurred within two hours of the shooting. The interview with Keyoshia and the lineups occurred less than two days after the shooting. The witnesses were near the shooters at the time of the

shooting. Even if reliability had to be reached, the matter was within the trial court's discretion.

**{¶63}** Appellant next urges that the failure to call the three eyewitnesses to testify at the suppression hearing constituted ineffective assistance of trial counsel. We review a claim of ineffective assistance of counsel under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): deficient performance falling below an objective standard of reasonable representation and prejudice arising from the lawyer's serious error. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), ¶ 1 of syllabus. In evaluating the claim of deficient performance, the reviewing court must be highly deferential to counsel's tactics. *Strickland*, 466 U.S. at 689. The court should not focus on what, in hindsight, may have been a more appropriate course of defense. *See State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Even if there is deficient performance, the defendant must also establish prejudice and show that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different. *Bradley*, 42 Ohio St.3d 136 at ¶ 2 of syllabus. To establish that reasonable probability, the facts must be sufficient to undermine a court's confidence in the outcome. *Strickland*, 466 U.S. at 694.

**{¶64}** In reviewing the suppression motion, the trial court read Keyoshia's testimony from the juvenile court's probable cause hearing. She testified that she knew the two defendants from school and the neighborhood and had become friends with them in the six months before the incident. (Tr. 12-13, 28-29). She testified that the two defendants approached the victim in the driveway, pulled out guns, told him he had five seconds to empty his pockets, and then both defendants started shooting. (Tr. 12-15). She insisted that it was appellant who perpetrated the shooting with Royal, later adding that she was positive that these two defendants

shot the victim. (Tr. 32-34, 39). She also explained that she initially did not want to get involved. (Tr. 38-39).

{¶65} Moreover, the trial court reviewed the videotaped statements of the three witnesses and the videotaped line-ups in making its suppression decision. There is no indication that the trial court's decision on suppression would have been different had counsel called the witnesses to testify at the suppression hearing. Thus, appellant's argument on ineffective assistance in failing to call the three witnesses to testify at the suppression hearing is overruled.

{¶66} We also note that the trial testimony given a few days after the suppression hearing shows that the witnesses would not have furthered appellant's arguments. *See State v. West*, 7th Dist. No. 11MA33, 2012-Ohio-2758, ¶ 29 (can view trial transcript to see if failing to call witnesses to testify in support of suppression motion was ineffective assistance of counsel). Distinguished from *State v. Wright*, 7th Dist. No. 03MA112, 2004-Ohio-6802, ¶ 30 (cannot use later trial testimony to argue against court's suppression ruling itself). They were cross-examined as to any police pressure involved in repeatedly asking them the same question and in mentioning the suspects' names. Miranda and Keyoshia explained their reasons for hesitancy and their ultimate decision to tell what they knew. They were nervous and scared (at ages 14 and 17). Keyoshia expressed her current level of certainty as positive and said she was sure of her photo identification. Nautica explained that she could not pick out the defendants from the lineup due to differences in their hair in the photographs.

{¶67} In addition, the house sat very close to the sidewalk on the main thoroughfare of South Avenue, and the driveway was not long. The witnesses were on the front porch, the victim was steps away, and the shooters were close to the victim while they ordered him to empty his pockets. A witness saw appellant run back to collect his shell casings. As to darkness, it was explained that a bright street light was directly across the street from the house. Some lighting is also implicated in the testimony that at least one vehicle on South Avenue was approaching the scene, the one Royal crashed into as he fled. The defense delved into all these subjects on

cross-examination and did a good job questioning the witnesses' credibility, but had this same testimony been presented at the suppression hearing, it cannot be said that the outcome of the suppression hearing would have been different.

**{¶68}** Finally, appellant briefly raises ineffective assistance counsel in questioning the captain (rather than the detective who assembled the array) concerning the details on the filler photographs. This revolves around the trial court's refusal to permit co-defendant's counsel to ask the captain about whether the filler photos resembled Royal. (Supp.Tr. 94-95). The state objected on the grounds that the suppression motion failed to raise a contention as to the photographs used to compose the line-up. (Tr. 95-96). The trial court agreed. Thus, it would not have mattered whether counsel questioned the detective instead of the captain.

**{¶69}** Appellant also states that the trial court erred in prohibiting this questioning of the captain. However, the question dealt with Royal. Furthermore, the lineup was before the trial court, and its contents could be used to judge whether addendums to an already untimely motion would be permitted. Regardless, there are no allegations presented here as to why the photographs in the lineup itself are unduly suggestive. Lastly, we point out that photographs in a lineup need not be nearly identical. *See Davis,* 76 Ohio St.3d at 112 (even significant differences will not necessarily deny a defendant due process). This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

**{¶70}** Appellant's final assignment of error alleges:

**{¶71}** "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTIONS FOR AGGRAVATED MURDER, AGGRAVATED ROBBERY WITH FIREARM SPECIFICATIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."

**{¶72}** Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In reviewing a manifest

weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

**{¶73}** A reversal on weight of the evidence is ordered only in exceptional circumstances. *Id.* In conducting our review, we proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Rather, we defer to the fact-finder who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶74}** This is because if there are two reasonable views of the evidence, it cannot be said that the jury clearly lost its way and created a manifest miscarriage of justice. The appellate court is especially deferential to a jury verdict as the elimination of such a verdict results in the reviewing court sitting as "the thirteenth juror." *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. In fact, only a unanimous three-judge panel can reverse a jury verdict on manifest weight grounds. Ohio Constitution, Art. IV, Section 3(B)(3).

**{¶75}** Appellant argues that any finding that he was one of the two shooters was against the manifest weight of the evidence. He questions the credibility of the identification testimony given by the three eyewitnesses. He criticizes the police investigation, which he characterizes as stopping on the day of the photographic line-up (less than 48 hours after the shooting). He states that a lead on another suspect was not explored. He also complains that no ballistic tests were conducted, a gunshot residue kit was collected but never submitted for testing, and no search warrants were issued at the defendants' residences.

{¶76} Nonetheless, there is no indication that evidence (especially exculpatory evidence) would have been discovered at the official addresses of the suspects' parents or guardians, and the defendants were not arrested at those locations. There is also no indication that ballistics would have been helpful. Two bullets were recovered from the victim, but there were three separate entrance wounds (and there was testimony that three to four shots were fired). As only two bullets were recovered, even if ballistics would have shown that those bullets were fired from the same gun, this would not have demonstrated that only one person fired shots. Moreover, no weapons or shell casings were recovered. In fact, upon fleeing the scene, it was said that appellant briefly returned to collect his shell casing or casings. (Tr. 776).

{¶77} In many cases the defense criticizes the state's failure to run certain testing. However, the defense also had the ability to seek testing on the bullets or the gunshot residue kit. Additionally, testimony established that any potential gunshot residue on the victim's hands could be explained by the fact that he was shot from a close range. (Tr. 909). Plus, there was testimony that the victim was holding the gunshot wound to his abdomen as he died. (Tr. 652, 665, 777).

{¶78} As for an additional or a different suspect, the police received a tip alleging involvement by appellant's friend, who was at a party with appellant and Royal that night. Yet, this tip was not ignored. The lead detective testified that this suspect was interviewed and the police decided that he was not involved. (Tr. 909-911). Moreover, the three witnesses testified to only two shooters and identified appellant and Royal as those shooters.

{¶79} Appellant notes that the assisting detective testified that police initially gained appellant's nickname from hearsay in the crowd that gathered around the scene. (Tr. 923-924). This was said to be a standard police investigative tool, providing quick guidance as to where to begin an investigation. It does not detract from later identifications. The fact that the police did not then follow-up with this witness from the crowd does not negatively reflect on the police as she did not witness the event. She was utilized as a starting point.

**{¶80}** All three witnesses identified appellant from the stand as one of the gunmen. Miranda explained that she denied knowing the shooters for the first twenty-five minutes of her interview because she was nervous as she had just witnessed a killing; notably, she was a fourteen-year-old who had just been on her knees holding her friend as he died. (Tr. 778, 780). She testified that she knew the names at the beginning of the interview but she was just not saying the names. (Tr. 794). Her testimony suggests that once she discovered that the police already knew the names, she was able to bring herself to cooperate more fully. (Tr. 780-794). And, Miranda later picked appellant out of a line-up. She disclosed that she used to see Ray Royal and Little D at a local store "all the time." (Tr. 780-781). She testified that she was able to see their faces the night of the shooting. (Tr. 782). She asserted that they both fired shots. (Tr. 776). As appellant points out, this witness had been prescribed glasses a couple years before for her astigmatism, which she was not wearing that night as she had previously decided that she did not need them. (Tr. 804-805, 807). She also mentioned that Keyoshia may have smoked marijuana that night.

**{¶81}** Nautica was not provided names by police during her interview, and she named Ray Royal and Boosie as the shooters. (Tr. 577-578). A detective testified that she had no chance to speak with Miranda after Miranda's interview. Nautica explained that she knew appellant as Boosie but others called him Little D. (Tr. 572). Even though she could not pick either defendant from the line-up, she explained that she believed this was due to their different hairstyles in the photos. (Tr. 580). Although she heard people in the crowd mentioning the defendants' names as she sat in a police car waiting to be transported, she expressed that she was positive they were the gunmen. (Tr. 580, 585).

**{¶82}** Appellant emphasizes that Nautica did not see the actual shooting as she turned to call for her mom when she saw the defendants approach with guns and make demands on the victim. (Tr. 567). As appellant points out, Nautica has a bad eye and was not wearing her glasses at the time of the shooting because they were broken. (Tr. 604). However, she insisted that she could see distance, and the state

suggested that this may have been why she could not pick out appellant from the photo lineup (i.e. she did not have on glasses to help her see near objects). (Tr. 604). This witness also provided the testimony about Royal almost being run over by a car while fleeing across South Avenue. (Tr. 636).

{¶83} Keyoshia had to be jailed on a material witness warrant due to her reluctance to testify. She called the victim to walk her home that night. She witnessed the robbery after exiting the house with her one-year-old in a stroller. (Tr. 470-471). She stated that both defendants fired shots. (Tr. 474). She testified that the light was bright and she also knew their voices. (Tr. 539-540). She was sure about identifying their photographs, and she was positive that these defendants shot Brandon. (Tr. 483).

{¶84} In explaining why she did not provide police with names during the interview, Keyoshia confusingly stated that she knew the names but was not sure about the names until she saw the photographs. (Tr. 480-481). She then explained that she knew these defendants from Facebook and because they all went to the same high school. (Tr. 482). She also said that they have been around the house on South Avenue many times in the past. (Tr. 485). Finally, she revealed that she did not initially provide the names to police because she was scared for her life. (Tr. 548).

{¶85} In sum, we have three witnesses who testified that they were on the porch talking to the victim who was standing just off the porch when appellant and his co-defendant approached and told the victim he had five seconds to empty his pockets. One witness added that the gunmen also told the victim to lift his shirt. They testified that the victim was shot before he could finish complying. Both defendants were said to have guns, and both were said to have fired. As aforementioned, appellant was even said to have briefly run back to collect the casings, which helps establish not only that he fired a shot but also provides another opportunity for the witnesses to view him.

{¶86} A jury view was conducted and photographs were submitted demonstrating how close the house and its porch were to the street, sidewalk, and

driveway and from which the jury could notice where the street lights were located. Testimony was presented that street lights illuminated the faces of the shooters, even if they may have put their hoods up. The defense urged that the closest street light was on the opposite side of the street, thus surmising that it would be difficult to discern facial features. Yet, the angle of viewing or the shooters' position in relation to the light may not have been straight on. In any case, the sufficiency of the lighting on a busy Youngstown corridor was a jury question. That Royal crashed into an approaching vehicle just after the shooting may suggest the presence of headlights at the scene as well.

{¶87} Appellant asserts the existence of various discrepancies in these testimonials as set forth above and on issues such as whether the witnesses spoke to each other the day after the shooting and before the line-ups and whether the victim entered the house when he first arrived or whether that occurred when he was over earlier that day. Nevertheless, the jury heard what was presented to them by the witnesses, both the similarities and the discrepancies and claimed discrepancies. The credibility of the three witnesses was thoroughly tested on cross-examination. The jury could have disbelieved them, concluding that their identifications were not credible. However, the jury was not required to so find. The jury saw the two fifteen-year-olds and the eighteen-year-old testify about the shooting they witnessed (when they were fourteen and seventeen. The jury heard their voice inflections and witnessed their gestures. The jury was in the best position to ascertain whether the witnesses were lying, mistaken, or uncertain. We shall not sit as the thirteenth juror and disturb that conclusion. This assignment of error is overruled.

{¶88} For the foregoing reasons, the judgment of the trial court is affirmed.

Donofrio, J., concurs.
DeGenaro, P.J., concurs.